Jule Rousseau
Eric Adam Biderman
ARENT FOX LLP
1675 Broadway
New York, NY  10019
(212) 484-3900

*Attorneys for Arnold Young*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------x

In re:

      HERMAN SEGAL,

                Debtor.

--------------------------------------------------------x

ARNOLD YOUNG,

                Plaintiff,

      -against-

HERMAN SEGAL,

                Defendant.

--------------------------------------------------------x

Chapter 7

Case No. 13-45519 (NHL)

Adv. Proc. _____

**COMPLAINT FOR A DETERMINATION OF DISCHARGEABILITY AND DENIAL OF THE DEBTOR'S DISCHARGE**

       Plaintiff, Arnold Young ("Plaintiff" or "Mr. Young"), by and through his undersigned attorneys, files this Complaint against Herman Segal, the above-captioned debtor and defendant ("Debtor" or "Defendant"), seeking a determination of dischargeability and denial of the Debtor's discharge, and in support thereof respectfully alleges as follows:

### <u>NATURE OF ACTION</u>

       1.     This adversary proceeding relates to the Debtor's bankruptcy case, *In re Segal*, Case No. 13-45519, which is pending under chapter 7 of the Bankruptcy Code before this Court.

2.      This action is for (i) a determination of dischargeability under sections 523(a)(2), (a)(3)(B), and (a)(6); and (ii) denial of the Debtor's discharge under sections 727(a)(3), (a)(4)(C) and (c)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(4), 7001(6) and 7003 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)").

3.      This action arises out of a series of transactions involving the Defendant's acquisition of life insurance policies on the life of Mr. Young (the "Policies") through a series of arrangements that are commonly known as Stranger-Originated Life Insurance ("STOLI"), which Defendant originated and orchestrated in 2008 (collectively, the "STOLI Transaction").

4.      In 2008, Defendant induced by false pretenses, false representations and fraud on Mr. Young to participate in the STOLI Transaction in which Defendant, and others working on Defendant's behalf, would procure and finance several life insurance policies on Mr. Young's life, *i.e.,* the Policies, for the purpose of later selling the Policies for profit in one or more life settlement transactions.

5.      In early 2008, Defendant made representations and promises to Mr. Young that the STOLI Transaction would involve establishment of life insurance trusts and would be financed through loans provided by Defendant and/or his controlled entity, Omega Capital ("Omega").

6.      Defendant made representations and promises to Mr. Young that the STOLI Transaction was lawful and that neither Mr. Young nor his children would have any risk, liability or obligation—including any tax liability—as a result of the STOLI Transaction.

7.      On November 3, 2008, Defendant provided Mr. Young with a "Term Sheet" that provided details about the proposed STOLI Transaction, the Policies and how the Policies would be funded (hereafter, the "Term Sheet").  A copy of this Term Sheet is annexed as **Exhibit A**.

8.      Subsequently, Defendant provided Mr. Young a document titled "Draft 11/10/08 (For Discussion Purposes Only) Agreement" (hereafter, the "Draft Agreement").  A copy of the Draft Agreement is annexed as **Exhibit B**.

9.      Both the Draft Agreement and the Term Sheet show amounts of the policies' funding, totaling in excess of $4.5 million, and provide that the funding to the subject trusts would be advanced by Omega and/or Defendant, consistent with Defendant's prior representations and promises to Mr. Young.

10.     Despite the representations and promises made by Defendant to Mr. Young that the funding to the subject trusts would be advanced by Omega and/or Defendant, Defendant, and/or persons acting on his behalf and/or at his direction, had arranged for several of the Policies to be funded through loans provided by an entity named HM Ruby Fund, L.P. ("HM Ruby").

11.     Despite the representations and promises made by Defendant to Mr. Young that the funding to the subject trusts would be advanced by Omega and/or Defendant, HM Ruby provided loans to fund the premiums payments due on the Policies during the first two years that the respective Policies were in force.

12.     Defendant did not mention to Mr. Young HM Ruby's involvement at the time Mr. Young agreed to participate in the STOLI Transaction.  In fact, Mr. Young did not become aware of HM Ruby's involvement in the STOLI Transaction until well after the time the STOLI Transaction was entered into.

13.     Contrary to the representations and promises made by Defendant to Mr. Young, the loans related to the STOLI Transaction were not non-recourse, but entitled HM Ruby, and its assignees, to seek recourse for nonpayment of the loans against Mr. Young.

AFDOCS/11002371.10

14.    Upon information and belief, when Defendant provided the Draft Agreement and Term Sheet to Mr. Young, Defendant was aware that a loan provided by HM Ruby required, as a condition, that Mr. Young personally guarantee such loan – which was contrary to what Defendant had represented to Mr. Young about the STOLI Transaction, and contrary to the provisions of both the Draft Agreement and Term Sheet.

15.    Defendant sought to ensure Mr. Young's continued participation in the STOLI Transaction by knowingly and fraudulently withholding from Mr. Young information that, if known, would have caused Mr. Young to cease his participation in the STOLI Transaction. Upon information and belief, it was always Defendant's intention to withhold from Mr. Young this information that, if known, would have caused Mr. Young to cease his participation in the STOLI Transaction.

16.    Furthermore, in and around the time that Mr. Young became involved in the first lawsuit related to the Policy that is discussed below,  Defendant confirmed to Mr. Young that Mr. Young's signature was forged on a number of documents, including the Credit Agreement and Guaranty (as defined below) that were required by and provided to HM Ruby.

17.    The STOLI Transaction was perpetrated by Defendant by false pretenses, false representations and fraud and caused Mr. Young to incur significant monetary damages, including legal fees, costs and expenses, as well as caused willful and malicious injury to Mr. Young and/or Mr. Young's property.

18.    Upon information and belief, Defendant profited from the STOLI Transaction because Defendant received a substantial portion, if not all, of the approximately $3 million in sales commissions that are believed to have been paid to Defendant's son, who served as the insurance agent for the Policies, by the insurance companies that issued the Policies.

4

19.     Mr. Young relied on the representations and promises he received from Defendant that the STOLI Transaction was lawful, that the loans involved in the STOLI Transaction would be non-recourse, and that neither Mr. Young nor his children would otherwise have any liability to anyone in connection with the STOLI Transaction.  In fact, Mr. Young would not have agreed to participate in the STOLI Transaction had he not received these promises and assurances from Defendant.

20.     Contrary to Defendant's representations, Mr. Young incurred liability as a result of the STOLI Transaction orchestrated by Defendant.  In particular, Mr. Young was forced to incur extensive legal fees, costs and expenses to defend, and eventually bring about a settlement of, a lawsuit commenced against Mr. Young by the holder of Credit Agreement and Guaranty discussed more fully below.  This lawsuit was brought against Mr. Young solely as a result of the STOLI Transaction originated by Defendant and a guaranty that Defendant acknowledged had been forged in the name of Mr. Young.

21.     Additionally, Mr. Young was forced to incur further legal costs and expenses in connection with a second lawsuit that was brought against Mr. Young by the insurance carrier that issued the subject policy.  This second lawsuit was, again, brought against Mr. Young solely as a result of the STOLI Transaction originated by Defendant and the guaranty that was forged in the name of Mr. Young.

22.     Mr. Young incurred the various legal fees, costs and expenses as a result of Defendant's false pretenses, false representations and fraud, including Defendant's promises that neither Mr. Young nor his children would have any liability to any party in connection with the STOLI Transaction and promises to indemnify Mr. Young with regard to the STOLI Transaction.

AFDOCS/11002371.10

23.    Based on the foregoing, Mr. Young brings this action for a determination that the debt owed by the Debtor to Mr. Young is non-dischargeable under sections 523(a)(2), (3), and (6) of the Bankruptcy Code.

24.    In addition, upon information and belief, Defendant concealed, destroyed, mutilated, falsified, or failed to keep or preserve documents, records and papers related to the STOLI Transaction and therefore, Mr. Young brings this action for denial of the Debtor's discharge under sections 727(a)(3) and (c)(1) of the Bankruptcy Code.

25.    Finally, upon information and belief, the Debtor knowingly and fraudulently, in connection with this case, filed incomplete schedules and statement of financial affairs, failed to file a list of creditors and a schedule of current income and current expenditures, failed to list Mr. Young or the debt the Debtor owes to Mr. Young, failed to appear at the 341 Meeting, and purposefully failed to give notice of the bankruptcy case, the 341 Meeting, and any important dates and relevant deadlines in this case to Mr. Young.  Thus, upon information and belief, the Debtors attempted to take advantage of Mr. Young, this Court, and the bankruptcy process and his discharge should therefore be denied under sections 727(a)(4)(C) and (c)(1) of the Bankruptcy Code.

## PARTIES

26.    Plaintiff, Arnold Young, is an individual residing at 110 John Street, Clark, New Jersey, 07066-1804.  Mr. Young is a creditor of the Debtor and is empowered to bring this action under sections 523(c)(1) and 727(c)(1) the Bankruptcy Code.

27.    Upon information and belief, Defendant is an individual with a principal place of residence at 4115 Quentin Road, Brooklyn, New York 11234.

AFDOCS/11002371.10

**JURISDICTION AND VENUE**

28.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

29.     This is a core proceeding under 28 U.S.C. § 157(b)(2).

30.     Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

31.     Venue is proper in this district under 28 U.S.C. § 1408 and 1409.

32.     This is an action commenced under sections 523(a)(2), (a)(3)(B), and (a)(6) and 727(a)(3), (a)(4)(C) and (c)(1) of the Bankruptcy Code and Bankruptcy Rules 7001(4), 7001(6) and 7003.

**FACTUAL ALLEGATIONS**

A.      **STOLI Transaction**

33.     Mr. Young first became aware of the STOLI Transaction in early 2008, at a meeting with an attorney named Alan Rubenstein ("Rubenstein").  At that meeting (hereafter referred to as the "First Meeting"), the STOLI Transaction was presented to Mr. Young as an opportunity to potentially provide his children with a future financial benefit.  This so-called opportunity called for Mr. Young to allow his life to be insured by an investment group led by Defendant with whom Rubenstein had an ongoing relationship.

34.     At the First Meeting, Rubenstein, with the consent and authority of Defendant, advised Mr. Young that the so-called opportunity, *i.e.,* the STOLI Transaction, would be at no cost to Mr. Young or to his children, and assured Mr. Young, as an attorney, that the so-called opportunity would be lawful and would be handled by professionals.

35.     After the First Meeting, also in early 2008, Mr. Young had another meeting with Rubenstein, when Rubenstein introduced Mr. Young to Defendant (the "Second Meeting").

7

36.    At the Second Meeting, Defendant formally presented Mr. Young with the STOLI Transaction, which was referred to as a financial opportunity by Rubenstein at the First Meeting.

37.    During the Second Meeting, Defendant advised Mr. Young that Defendant was a partner in Omega, and that Omega, along with other related and controlled parties, wanted to engage in a transaction (the Transaction) to fund one or more life insurance policies that would be issued on Mr. Young's life (the Policies).

38.    During the Second Meeting, Defendant further advised Mr. Young that the STOLI Transaction would involve the establishment of life insurance trusts that would own the Policies, and that Defendant and/or Omega would make all financing arrangements to pay premiums on the Policies.  According to Defendant, Omega would loan the trusts the necessary funds to pay premiums on the Policies.

39.    Defendant also advised Mr. Young, at the Second Meeting, that Mr. Young would have limited or no involvement in the STOLI Transaction, i.e., just signing the applicable applications for the Policies and providing access to medical records and information. Defendants also stated that neither Mr. Young nor his family would bear any of the costs of the Policies or face any liabilities as a result of the STOLI Transaction.

40.    Based on the statements and representations made by Defendant, Mr. Young and Defendant agreed to participate in the STOLI Transaction.  The Policies, which had a total combined face amount of $60 million, were applied for through Defendant's son, who served as the agent for the Policies, which allowed him to receive substantial sales commissions from the insurance companies that issued the Policies that were at least equal to the amount of the premiums payable during the first year of each of the Policies.  According to the information

contained in the Term Sheet, the total amount of the premiums payable during the first year of the Polices was $3,304,500.

41.     Upon information and belief, at or before the time that Mr. Young agreed to participate in the STOLI Transaction, Defendant, and/or persons acting on his behalf, had arranged for several of the Policies to be funded through loans provided by an entity named HM Ruby.

42.     HM Ruby provided loans to fund at least three of the six Policies.  Defendant did not advise Mr. Young of these loans and in fact intentionally withheld their existence, and Mr. Young did not become aware of HM Ruby's involvement with the Policies until well after the time he had agreed to participate in the STOLI Transaction.

43.     Upon information and belief, Defendant was aware of HM Ruby's involvement with the Policies at the time Mr. Young agreed to participate in the STOLI Transaction. Nonetheless, Defendant failed to disclose and did not make Mr. Young aware of HM Ruby's involvement when Mr. Young agreed to participate in the STOLI Transaction.

44.     On November 3, 2008, at least two months after the HM Ruby loans were made, Defendant actively concealed the fraudulent loans by providing Mr. Young with the Term Sheet that provided details about the Policies and how they were to be funded by entities controlled by Defendant.  *See* Term Sheet (Exhibit A).

45.     Subsequent to receiving the aforementioned Term Sheet, Mr. Young received the Draft Agreement from Defendant, which contains much more detailed information about the Term Sheet.  *See* Draft Agreement (Exhibit B).

46.     Both the Draft Agreement and the Term Sheet show amounts of policy funding, totaling in excess of $4.5 million, and provide that the funding would be advanced by Omega

9

and/or Defendant, consistent with what Defendant had represented to Mr. Young before. These documents were fraudulent because Defendant was aware that HM Ruby was making three loans—and other unknown persons may have made other loans[1]—not Defendant, and the terms were intentionally misleading and were presented to Mr. Young by Defendant in furtherance of the fraud.

47.    Paragraph 2 on page 3 of the Draft Agreement contained the following information that was most important to Mr. Young:

> Pursuant to the schedule below, Omega Capital will advance funds to the Trusts to pay for the first 2 years of premium payments. The only parties to these loans are Omega, as lender, and the Trusts, respectively, as borrowers. The loans are non-recourse. The loan is collateralized only by the Policy. Neither Arnold Young, the Beneficiaries, nor the Trustees have any legal obligation with respect to the loans. Any outstanding loan balance is payable solely from the receipt of sale proceeds upon the sale of any Policy or upon the payment of any death benefit.

Draft Agreement (Exhibit B), ¶ 2.

48.    Before Defendant provided the Draft Agreement and Term Sheet to Mr. Young, the Principal Policy (as such term is defined below) had already been funded through a loan from HM Ruby.[2] Defendant did not advise Mr. Young as to such HM Ruby loan, however, when he provided Mr. Young with the Draft Agreement and Term Sheet.

49.    Defendant was aware of such HM Ruby loan when he provided the Draft Agreement and Term Sheet to Mr. Young.

---

[1] Mr. Young reserves all of his rights, claims, causes of action, and defenses, including the right to amend this complaint, to assert additional claims, and/or to file and prosecute other claims or actions in a different forum against other persons or entities, as appropriate, after additional information becomes available through discovery or otherwise.

[2] As a result of the Apliko Action, in June 2013, Mr. Young learned for the first time that the Principal policy was issued on or about May 15, 2008.

50.     Before Defendant provided the Draft Agreement and Term Sheet to Mr. Young, Defendant was aware that HM Ruby required, as a condition of its loan, that Mr. Young personally guarantee the loan (which was contrary to Defendant's representations to Mr. Young about the STOLI Transaction and contrary to the Draft Agreement and the Term Sheet).

51.     Before Defendant provided the Draft Agreement and Term Sheet to Mr. Young, Defendant was further aware that, at Defendant's instruction, someone had forged Mr. Young's signature on guaranty agreements that were provided to HM Ruby by Defendant prior to the presentation of the Draft Agreement and Term Sheet to Mr. Young.

52.     Both the Draft Agreement and Term Sheet reference the creation of insurance trusts, and name specific trusts, each bearing Mr. Young's name in the title.   Mr. Young, however, did not execute any trust agreement in 2008.

53.     Subsequent to being provided with the Draft Agreement and Term Sheet by the Defendant, Mr. Young became concerned about several aspects of the STOLI Transaction, discussed the matter with family members and decided that they should seek counsel to fully evaluate the matter and protect their interests before entering into any agreements.

54.     At some point in the Fall of 2010, Mr. Young was advised by his counsel that, contrary to what Mr. Young had been told by Rubenstein and the Defendant, and contrary to the provisions of the Term Sheet and the Draft Agreement, three of the six Policies had been funded through loans that had been provided by HM Ruby.

55.     Prior to counsel advising Mr. Young of such information, which information counsel learned from Defendant, Mr. Young had no knowledge of HM Ruby or of any entity claiming to provide funds for any of the Policies other than Omega, and Mr. Young had

11

continued to believe, as he was told throughout 2008, that Omega had provided the funding for all of the loans.

56.     When Mr. Young first learned of the involvement of HM Ruby, in the fall of 2010, Mr. Young's counsel sent him a copy of various HM Ruby loan documents that counsel had received from Defendant.   These documents included credit agreement and guaranty documents that each had a line for Mr. Young's signature but which were each unsigned.   The credit agreement and guaranty documents that Mr. Young received related to three of the six Policies.

57.     When Mr. Young reviewed these credit agreement and guaranty documents, it was readily apparent to him that he had never seen any of the documents before.

58.     Mr. Young had never been asked by anyone associated with the STOLI Transaction to guarantee any obligation.   In fact, had Mr. Young received any indication that he would be asked to personally guarantee any loan amount as part of the STOLI Transaction, which he did not, he would have refused to engage in the STOLI Transaction.

59.     In 2011, however, to avoid potential tax liability, Mr. Young had six individual trusts prepared, which Mr. Young subsequently executed and which Defendant arranged to have executed by the trustees who were named in the Draft Agreement.   Those trust agreements are all dated effective March 2011.

60.     On or about June 25, 2013, an entity called Apliko, LLC ("Apliko") commenced an action against Mr. Young in New York Supreme Court, New York County captioned: *Apliko, LLC v. Arnold Young,* Index No. 652226/2013 (the "Apliko Action").   Defendant was not named as a party in the Apliko Action.   Furthermore, other than during a brief period of time immediately following the commencement of the Apliko Action, Defendant has been

12

unresponsive to communications directed to him by Mr. Young since the commencement of the Apliko Action.

61.     The Apliko Action, which was commenced by summary judgment in lieu of complaint, sought to recover from Mr. Young the unpaid balance of a loan (the "Loan") that HM Ruby had provided in connection with one of the Policies.

62.     The Policy to which the Loan related was a $10 million life insurance policy, bearing Policy Number 6095482 that was issued on Mr. Young's life by Principal Life Insurance Company on or about May 15, 2008 (the "Principal Policy").

63.     In the Apliko Action, Apliko alleged that, pursuant to the Loan, HM Ruby had lent the sum of $1,042,134 to a life insurance trust named the Arnold Young Irrevocable Life Insurance Trust (the "Young Trust").

64.     Apliko alleged that the Loan was evidenced by a credit agreement entered into by and between the Young Trust and HM Ruby as of August 26, 2008 (the "Credit Agreement"), and a promissory note executed by the Young Trust in favor of HM Ruby, and dated as of August 26, 2008 (the "Note").

65.     According to the Apliko Action, in connection with the Loan, Mr. Young allegedly had executed a personal guaranty dated August 26, 2008 (the "Guaranty"), in which Mr. Young allegedly guaranteed prompt payment of all sums due and owing to HM Ruby, and to its successors and assigns, under the Loan.

66.     Among the papers filed by Apliko in the Apliko Action were purported copies of the Credit Agreement, Note, and Guaranty.  The Guaranty and the Credit Agreement filed in the Apliko Action were not among the unsigned credit agreement and guaranty documents that Mr. Young had received from Defendant in the fall of 2010.

67.    The copy of the Guaranty provided by Apliko indicated that it was allegedly executed by Mr. Young on August 26, 2008.

68.    The purported copy of the Credit Agreement provided by Apliko also indicated that it was allegedly executed by Mr. Young on August 26, 2008.

69.    Furthermore, the alleged signatures of Mr. Young appearing on the Credit Agreement and Guaranty were purported to have been notarized later, on September 2, 2008.

70.    In the Apliko Action, Apliko asserted a single claim against Mr. Young for repayment of the outstanding balance under the Loan provided by HM Ruby.  In particular, Apliko contended that the Young Trust had failed to make payment when due under the Loan and that, as a result, Mr. Young was required, pursuant to the Guaranty, to repay the outstanding Loan balance.

71.    Apliko claimed that the amount required to be paid by Mr. Young under the Guaranty consisted of the following sums: (a) $1,042,134, representing the original principal balance of the Loan; (b) interest that accrued on the principal balance of the Loan from August 26, 2008 at a rate of 10% per annum; and (c) attorneys' fees and costs incurred by Apliko in connection with its collection efforts against Mr. Young.

72.    Apliko brought the Apliko Action because it was an assignee under the Loan.

73.    Before the commencement of the Apliko Action, HM Ruby purportedly assigned all of its right, title, and interest in the Loan to an entity called Teleios PF Loans DE, LLC ("Teleios").

74.    Teleios purportedly assigned to Apliko all of the right, title, and interest in the Loan that purportedly had been assigned to Teleios by HM Ruby.

75.      The Apliko Action came as a surprise to Mr. Young because, as previously noted, Mr. Young had never been asked by anyone associated with the STOLI Transaction to guarantee any obligation.  Had Mr. Young received any indication that he would be asked to personally guarantee any loan amount as part of the STOLI Transaction, which he did not, he would have refused to engage in the STOLI Transaction.

76.      At the time of Apliko Action, and at times subsequent thereto, Mr. Young reviewed the Credit Agreement and Guaranty that were filed as part of the Apliko Action. Mr. Young does not recognize his purported signature on any of the documents as his own, and does not recall that he had ever executed any such document.

77.      In addition, Mr. Young does not recall having appeared before a notary public, for any purpose, in and around September 2, 2008, the date on which his purported signatures on the Credit Agreement and Guaranty were allegedly notarized.

78.      Mr. Young would have refused to sign documents like the Credit Agreement and Guaranty had he been asked to do so.

79.      Furthermore, the Credit Agreement purports to have been entered into by a trust bearing the name of the Young Trust in 2008, even though Mr. Young did not execute any trust agreement of any kind in 2008.

80.      As noted above, Mr. Young executed several trust agreements in March 2011, one of which was an agreement for the Young Trust.  Such trust agreement executed in March 2011 was the only trust agreement for the Young Trust that Mr. Young ever executed.

81.      On July 17, 2013, Mr. Young removed the Apliko Action to the United States District Court for the Southern District of New York, where it continued to proceed under the caption, *Apliko, LLC v. Arnold Young,* Case No. 13-cv-04948 (AKH) (FM) (S.D.N.Y.).

82.     Shortly after the commencement of the Apliko Action, Mr. Young contacted Defendant to advise him of the Apliko Action and to request Defendant's assistance in both paying the legal expenses and showing that Defendant, or persons working at his direction, forged the signature of Mr. Young.

83.     Shortly after the commencement of the Apliko Action, Mr. Young provided Defendant with copies of the Credit Agreement and Guaranty.  Upon being presented with the Credit Agreement and Guaranty, Defendant represented that Mr. Young's purported signatures on both documents were forgeries.  At no time before did Defendant advise Mr. Young about the forgeries of Mr. Young's signatures on these documents.

84.     Upon information and belief, Defendant had long been aware of the forgeries of Mr. Young's signatures on the Credit Agreement and Guaranty because Defendant and/or persons acting on Defendant's behalf were responsible for the forgery of Mr. Young's signatures on both documents.

85.     Mr. Young specifically sought assurances from Defendant that Defendant and/or Omega would indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko Action because Defendant had represented to Mr. Young that neither Mr. Young nor his family would incur any liability in connection with the STOLI Transaction.

86.     Consistent with Defendant's prior representations to Mr. Young, Defendant initially advised Mr. Young that Defendant would fully indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko Action.

87.     However, when Mr. Young later contacted Defendant regarding the indemnity that Defendant had previously agreed to provide Mr. Young, no response was received.

16

88.    In October 2013, in an attempt to limit potential liability and to resolve the dispute without incurring further legal fees and litigation costs, Mr. Young and Apliko agreed to settle the Apliko Action.  As part of this settlement, Mr. Young agreed to pay Apliko the sum of $125,000.  Despite the settlement, Mr. Young incurred substantial legal fees and costs to defend, and eventually bring about the settlement of, the Apliko Action.

89.    Subsequent to the settlement of the Apliko Action, on or about January 10, 2014, Principal Life Insurance Company commenced the following action against Mr. Young, Defendant and others in the United States District Court for the District of New Jersey: *Principal Life Insurance Company v. Young et al.,* Case No. 14-cv-00198 (D.N.J.) (the "Principal Action").  The Principal Action was voluntarily dismissed, without prejudice, on or about March 25, 2014.

90.    Between the time of commencement and dismissal of the Principal Action, Mr. Young incurred legal costs and expenses as a result of the Principal Action that were in addition to those costs and expenses incurred by him in connection with the Apliko Action.

91.    Upon information and belief, the Principal Action came about because Apliko sought to enforce certain rights related to the Principal Policy that are purportedly provided under the Loan.

92.    Upon information and belief, the rights sought to be enforced by Apliko in the Principal Action were purportedly assigned to Apliko under the Loan assignments involving HM Ruby, Teleios and Apliko.

93.    Upon information and belief, the Principal Action would not have come about but for the Loan provided by HM Ruby, which originally was supposed to be provided by Defendant or Omega.

17

94.     As previously noted, the Loan only came about as a result of the STOLI Transaction, and Mr. Young only agreed to participate in the STOLI Transaction because Defendant represented to Mr. Young that neither he nor his family would incur any liability as a result of the STOLI Transaction.

95.     At the time of the Second Meeting, and on various occasions thereafter, Defendant represented to Mr. Young that Defendant would indemnify Mr. Young for any liability incurred by Mr. Young as a result of the STOLI Transaction, including but not limited any legal expenses incurred by Mr. Young as a result of the STOLI Transaction.

96.     To date, Defendant has not indemnified Mr. Young for any portion of the costs and expenses incurred by Mr. Young in connection with the Apliko and Principal Actions and has given no indication that he will do so in the future.

## DEBTOR'S BANKRUPTCY CASE, FAILURES,
## AND LACK OF NOTICE TO CREDITORS AND PLAINTIFF

97.     On September 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

98.     On or around the Petition Date, Richard E. O'Connell (the "Trustee"), was appointed interim chapter 7 trustee of the Debtor's estate and later became a permanent chapter 7 trustee in this case.

99.     The Debtor failed to provide notice to Plaintiff of the Debtor's bankruptcy filing and failed to schedule Mr. Young or the debt the Debtor owes to Mr. Young.

100.    On September 12, 2013, the Clerk of the Court issued a notice of the Debtor's failure to file the documents and disclosures required under the Bankruptcy Code [ECF No. 4].

101.    On September 14, 2013, the Clerk of the Court issued a notice of the Debtor's meeting of creditors (the "341 Meeting") scheduled for October 15, 2013 [ECF No. 7].

102.    On October 10, 2013, the Trustee's counsel filed a motion with this Court seeking an order compelling the Debtor to comply with his duties under the Bankruptcy Code and, among other things, file the Required Disclosures [ECF No. 15] (the "Motion to Compel").

103.    On October 15, 2013, Mr. O'Connell presided over the initial meeting of creditors held under section 341(a) of the Bankruptcy Code.    The Debtor failed to appear at the 341 Meeting.

104.    On November 6, 2013, this Court issued an order to show cause why the Debtor's bankruptcy case should not be dismissed for the Debtor's failure to fulfill his requirements under section 521 of the Bankruptcy Code.

105.    On November 21, 2013, a hearing was held before this Court, and both the Debtor and his counsel failed to appear at the hearing.

106.    On December 5, 2013, this Court entered an order granting the Motion to Compel (the "Compel Order"), which requires that by no later than December 23, 2013, the Debtor must: (a) file a list of creditors, a schedule of assets and liabilities, and a schedule of current income and current expenditures, as required under 11 U.S.C. § 521(a)(1)(A), (B)(i) and (ii); and (b) file a statement of financial affairs, as required under 11 U.S.C. § 521(a)(1)(B)(iii).

107.    On December 23, 2013, the Debtor filed, among other things, a set of essentially "blank" Summary of Schedules, Schedule F and other documents, where the Debtor responded in writing that he refuses to provide information on the schedules allegedly exercising his rights under the 5th Amendment.

108.    To date, the schedules and documents filed by the Debtor are incomplete and do not list Mr. Young or the debt the Debtor owes to Mr. Young.

109.    Mr. Young learned about the Debtor's bankruptcy case from the Trustee's counsel.

110.    On May 22, there was a hearing before the Court on Defendant's motion to dismiss the Chapter 7 case, but the contested matter has not been resolved.  Instead, it was scheduled for an evidentiary hearing to be held on July 7, 2014 and later adjourned by the Court to September 4, 2014.

## COUNT I
### (Claim for a Determination that the Debtor's Debt to Plaintiff Is Non-Dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code)

111.   Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

112.    Mr. Young's debt against Defendant, including money Mr. Young incurred on account of legal fees, costs and expenses, arose out of the STOLI Transaction that was obtained by Defendant by false pretenses, false representations and fraud.

113.    Specifically, before and after Mr. Young entered into the STOLI Transaction, and at all relevant times, Defendant repeatedly represented to Mr. Young that neither Mr. Young nor his children would have any legal obligation under any of the loans that were part of the STOLI Transaction, *i.e.,* that the loans would be non-recourse, and that neither Mr. Young nor his children would have any liability to any party in connection with the STOLI Transaction.

114.    When Mr. Young agreed to participate in the STOLI Transaction, Defendant was aware that the Principal Policy would be funded through the Loan from HM Ruby and that, as a condition of such Loan, Mr. Young would be required to execute the Credit Agreement and

Guaranty, or documents similar thereto.  This was in direct contrast to the information that Defendant had provided to Mr. Young about the STOLI Transaction in November 2011 – i.e., that Omega would provide all of the loans necessary to fund the Policies and that neither Mr. Young nor his family would incur any personal liability as a result of the STOLI Transaction.

115.   Defendant's representations proved to be false because the Credit Agreement and Guaranty, on which Mr. Young's signature was forged, entitled HM Ruby, and its assignee Apliko, to seek recourse for nonpayment of the Loan against Mr. Young, and because Mr. Young incurred extensive costs and expenses as a result of the Apliko and Principal Actions, both of which were on account of or related to the STOLI Transaction.

116.   In addition to withholding information from Mr. Young about the Loan, upon information and belief, Defendant: helped bring about the forgery of Mr. Young's signature on the Credit Agreement and Guaranty; knowingly failed to ever provide Mr. Young with copies of such documents; and knowingly failed to disclose the forgery of Mr. Young's signature on such documents until being presented with copies of such documents by Mr. Young subsequent to the commencement of the Apliko Action.

117.  Upon information and belief, Defendant knew that his representations to Mr. Young were false when he made them and/or made such representations recklessly without regard to whether they were true or false, as Defendant was aware, at the time he made the representations to Mr. Young.

118.  Defendant made his representations to Mr. Young to induce Mr. Young's participation in the STOLI Transaction.

119.  Defendant knew that Mr. Young would not have agreed to participate in the STOLI Transaction had Defendant not represented to him that the loans involved in the STOLI

Transaction would be non-recourse, and that neither Mr. Young nor his children would otherwise face liability to any party in connection with the STOLI Transaction.

120.    Mr. Young justifiably relied on Defendant's representations to him regarding the STOLI Transaction.

121.    Upon information and belief, Defendant induced Mr. Young to participate in the STOLI Transaction by false pretenses, by making false and misleading statements with the intent to deceive, and otherwise engaged in fraud to procure and finance the Policies on Mr. Young's life for the purpose of later selling those Policies for profit in one or more life settlement transactions.

122.    Due to Defendant's false pretenses, false representations and fraud, Mr. Young was misled about the STOLI Transaction and was wrongfully induced to participate in the STOLI Transaction that gave rise to the Apliko and Principal Actions and caused Mr. Young significant damages.

123.    As a direct and proximate result of Defendant's wrongful conduct, Mr. Young incurred damages consisting of $125,000.00, plus significant attorneys' fees, costs and litigation expenses in connection with the Apliko and Principal Actions, and continues to incur legal fees and costs to protect his rights against Defendant, and so the exact amount of Mr. Young's claim against Defendant will be determined at trial.

124.    Defendant's debt to Mr. Young is therefore non-dischargeable.

**COUNT II**
**(Claim for a Determination that the Debtor's Debt to Plaintiff Is**
**Non-Dischargeable under Section 523(a)(3)(B) of the Bankruptcy Code)**

125.    Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

AFDOCS/11002371.10

126.    When Defendant filed his chapter 7 case, Defendant failed to file, among other things, the following documents or make the following disclosures with his bankruptcy petition: (a) Summary of Schedules; (b) Schedule F; (c) Declaration Concerning Schedules; and (d) Statement of Financial Affairs.

127.    On December 23, 2013, the Debtor filed, among other things, a set of essentially "blank" Summary of Schedules, Schedule F and other documents, where the Debtor responded in writing that he refuses to provide information on the schedules allegedly exercising his rights under the 5th Amendment

128.    To date, the schedules and documents filed by the Debtor are incomplete and do not list Mr. Young or the debt the Debtor owes to Mr. Young as required under section 521(a)(1) of the Bankruptcy Code.

129.    Mr. Young's debt against Defendant is of a kind specified in sections 523(a)(2) of the Bankruptcy Code.

130.    Defendant knows about Mr. Young and the debt Defendant owes to Mr. Young.

131.    Defendant failed to provide notice to Mr. Young regarding Defendant's bankruptcy filing to permit Mr. Young to timely file a proof of claim and timely request for a determination of dischargeability of his debt against Defendant under section 523 of the Bankruptcy Code and Bankruptcy Rule 4007.

132.    Defendant's debt to Mr. Young is therefore non-dischargeable under section 523(a)(3)(B) of the Bankruptcy Code.

AFDOCS/11002371.10

## COUNT III
**(Claim for a Determination that the Debtor's Debt to Plaintiff Is
Non-Dischargeable under Section 523(a)(6) of the Bankruptcy Code)**

133.    Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

134.    At all relevant times, and for the purpose of inducing Mr. Young to enter into the STOLI Transaction, Defendant repeatedly made false representations to Mr. Young that neither Mr. Young nor his children would have any legal obligation under any of the loans that were part of the STOLI Transaction, *i.e.,* that the loans would be non-recourse, and that neither Mr. Young nor his children would have any liability to any party in connection with the STOLI Transaction.

135.    Defendant's representations proved to be false because the Credit Agreement and Guaranty, on which Mr. Young's signature was forged, entitled HM Ruby, and its assignee Apliko, to seek recourse for nonpayment of the Loan against Mr. Young, and because Mr. Young incurred substantial costs and expenses as a result of the Apliko and Principal Actions, both of which were on account of or related to the STOLI Transaction.

136.    Defendant made his representations to Mr. Young willfully without regard to whether they were true or false, as Defendant was aware, at the time he made the representations to Mr. Young.

137.    Defendant knew that the Principal Policy would be funded through the Loan from HM Ruby and that, as a condition of such Loan, Mr. Young would be required to execute the Credit Agreement and Guaranty, or similar documents. Yet, Defendant withheld such information from Mr. Young and knowingly failed to ever provide Mr. Young with copies of such documents with the express purpose of inducing Mr. Young's participation in the STOLI Transaction, defrauding Mr. Young and perpetuating Defendant's fraudulent schemes.

24

138.    In addition to withholding information from Mr. Young about the Loan, upon information and belief, Defendant helped bring about the forgery of Mr. Young's signature on the Credit Agreement and Guaranty and knowingly failed to disclose the forgery of Mr. Young's signature on such documents until being presented with copies of such documents by Mr. Young subsequent to the commencement of the Apliko Action.

139.    Defendant's conduct was wrongful and without just cause or excuse and inflicted significant harm upon, and caused significant injury and damages to, Mr. Young.

140.    Defendant's debt to Mr. Young arises out of Defendant's willful and malicious injury to Mr. Young and/or his property, including monetary damages consisting of $125,000.00, plus significant attorneys' fees, costs and litigation expenses Mr. Young incurred in connection with the Apliko and Principal Actions and continues to incur to protect his rights against Defendant.

141.    Defendant's debt to Mr. Young is therefore non-dischargeable.

## COUNT IV
### (Objection to Discharge under Sections 727(a)(3) and (c)(1))

142.    Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

143.    Upon information and belief, the Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve documents and recorded information from which the Debtor's financial condition and/or the STOLI Transaction might be ascertained.

144.    The Debtor's acts and/or failures to act are not justified under all of the circumstances of the case.  By virtue of the foregoing, Plaintiff requests that this Court deny a discharge to the Debtor under sections 727(a)(3) and (c)(1) of the Bankruptcy Code.

AFDOCS/11002371.10

## COUNT V
### (Objection to Discharge under Sections 727(a)(4)(C), and (c)(1))

145.    Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

146.    Upon information and belief, the Debtor knowingly and fraudulently, in connection with this case, filed incomplete schedules and statement of financial affairs, failed to file a list of creditors and a schedule of current income and current expenditures, failed to list Mr. Young or the debt the Debtor owes to Mr. Young, failed to appear at the 341 Meeting, and purposefully failed to give notice of the bankruptcy case, the 341 Meeting, and any important dates and relevant deadlines in this case to Mr. Young.

147.    Upon information and belief, the Debtor attempted to take advantage of Mr. Young, this Court, and the bankruptcy process.  The Debtor's acts and/or failures to act are not justified under all of the circumstances of the case.

148.    By virtue of the foregoing, Plaintiff requests that this Court deny a discharge to the Debtor under sections 727(a)(4)(C) and (c)(1) of the Bankruptcy Code.

AFDOCS/11002371.10

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that a judgment be entered against the Debtor (i) determining that the Debtor's debt to Plaintiff is non-dischargeable under sections 523(a)(2), (a)(3)(B), and (a)(6) of the Bankruptcy Code; (ii) denying the Debtor's discharge under sections 727(a)(3), (a)(4)(C) and (c)(1) of the Bankruptcy Code; and (iii) granting such further relief as this Court deems just and equitable under the circumstances.

Dated: New York, New York
       September 4, 2014

ARENT FOX LLP

Attorneys for Arnold Young

By:      */s/ Jule Rousseau*
      Jule Rousseau
      Eric Adam Biderman
      1675 Broadway
      New York, NY  10019
      (212) 484-3900

27